UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| MIDCO INTERNATIONAL, INC. EMPLOYEES PROFIT SHARING TRUST,<br><br>Plaintiff,<br><br>v.<br><br>METROPOLITAN LIFE INSURANCE COMPANY,<br><br>Defendant. | No. 14 CV 9470<br><br>Judge Manish S. Shah |

**MEMORANDUM OPINION AND ORDER**

Midco International, Inc. Employees Profit Sharing Trust brought this diversity suit alleging breach of contract by Metropolitan Life Insurance Company. Midco alleges that MetLife breached the covenant of good faith and fair dealing implied into their contract, last amended in 1999, when MetLife transferred Midco's assets and the responsibility to manage those assets to a third party in 2006. MetLife moves for summary judgment, and that motion is granted.

## I.     Legal Standard

Summary judgment is appropriate if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Justifiable inferences are drawn in the nonmovant's favor, *id.* at 255, and the party

seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

## II. Background[1]

Plaintiff is a trust established to administer a retirement plan for the employees of Midco International, Inc., a Chicago-based manufacturer of gas burners. Defendant MetLife provides investment options to employee retirement plans.

In 1980, Midco entered into a fixed investment option contract with New England Mutual Insurance Company. Midco plan participants received interest each year pursuant to a "declared rate" determined by New England Mutual. From 1980 until 1996, the declared rate was set by the performance of the assets in New England Mutual's general investment account. In 1996, MetLife acquired New England Mutual and took on the task of managing Midco's assets.

In 1999, Midco and MetLife agreed to renegotiate their contract. The 1999 agreement was made retroactively effective to 1995 and expressly provided that the

---

[1] The facts are taken from the parties' Local Rule 56.1 statements. [111], [122]. (Bracketed numbers refer to entries on the district court docket.) Facts that are not disputed by citations to evidence are deemed admitted, *see* LR 56.1(b)(3)(C); in other words, to the extent the parties interject argument, caveats, or characterizations in their responses to facts, but without controverting the asserted fact with evidence, the fact is admitted and I ignore the commentary in the Local Rule 56.1 statements. Certain exhibits are currently under seal. These documents and expert declarations were cited and relied on by the parties in briefing the summary judgment motion, and while many details were of marginal relevance to my decision, the documents were part of the decisionmaking process. The documents should be unsealed, unless they contain protected trade secrets (they are not otherwise privileged from public disclosure). MetLife shall file a statement within three weeks showing good cause for why the exhibits should remain under seal.

declared rate would be determined by MetLife "from time to time." The discretion granted by this provision in the 1999 contract forms the basis of Midco's breach of contract claim.

MetLife initially employed its discretion to set the declared rate based on the performance of its general investment account, just as New England Mutual had. In 2006, MetLife sold its 401(k) administration business to Great-West Life & Annuity Insurance Company. The transfer took the form of a 100% indemnity reinsurance transaction. As MetLife's expert described such a transaction, the seller of a book of business cedes 100% of the insurance risk to a third party, and the assets supporting those liabilities are also transferred. The seller also transfers administrative control of those assets, and the underlying holder of the annuity policy is encouraged to "repaper" with the third party. To repaper is to sign an entirely separate contract with the third-party administrator. Pursuant to this transaction, the Midco assets backing the 1999 contract were transferred to Great-West, and MetLife ceded responsibility for setting the declared rate to Great-West. The goal of this reinsurance transaction was to eventually get Midco's contract off of MetLife's books through repapering. MetLife had considered unilaterally terminating the Midco plan but opted for the Great-West transaction after concluding such an action would breach the contract.

MetLife informed Midco in 2006 that Midco's business had been transferred to Great-West, stating that Great-West would provide "recordkeeping and administrative services" while the "existing MetLife contract provisions will stay

the same." At that time, MetLife did not state where Midco's assets would be held or where the responsibility for setting the declared rate would lie. While MetLife's investment strategy involved aggressive risks with higher returns, Great-West's strategy was more conservative. The declared rate selected by Great-West continually decreased after Great-West acquired Midco's assets, falling from 6.7% in 2007 to 1.2% in 2016. MetLife retained the right to review Great-West's rate, but it never exercised that right.

Each year, Great-West prepared a Summary Annual Report, which was reviewed by Midco's trustee and distributed to plan participants from 2009 to 2014. The Midco plan trustees were required under ERISA to ensure that the information distributed to plan participants was accurate. These reports showed that Great-West, rather than MetLife, held the Midco assets (but the reports did not explicitly state that Great-West was now setting the declared rate of return on the assets).

After the 2006 transaction, the Midco fund website maintained by Great-West continued to refer to the "MetLife Stable Value Option." Investment guides and enrollment kits prepared for Midco by Great-West similarly referred to the "MetLife Stable Value Option." MetLife's own employee acknowledged that this label was confusing, as Great-West held and managed Midco's assets.

Great-West made efforts to repaper with Midco, but Midco declined such offers. Midco declined because of the firm's favorable history with the MetLife Stable Value Fund. In early 2014, a Midco representative reached out to Great-West to confirm that Midco's funds remained with MetLife. Great-West's senior

4

counsel informed Midco in a July 2014 email that Midco's assets were no longer in the MetLife general account. The senior counsel further stated that Great-West was the reinsurer and recordkeeper for the Midco plan.

Midco filed this suit in November 2014, alleging that MetLife breached the parties' contract. The complaint did not identify an express term in the contract that MetLife breached, but at the motion to dismiss stage, I understood Midco's theory to be that Great-West's control over the declared rate amounted to a breach of MetLife's obligation to set the rate in good faith. [28] at 2–3.

## III. Analysis

Under Illinois law, discretion granted to one party to a contract is limited by an implied covenant of good faith and fair dealing. *Beraha v. Baxter Health Care Corp.*, 956 F.2d 1436, 1443 (7th Cir. 1992) (citing cases). The party with discretion must "exercise that discretion reasonably and with proper motive, and may not do so arbitrarily, capriciously or in a manner inconsistent with the reasonable expectations of the parties." *Interim Health Care of N. Illinois, Inc. v. Interim Health Care, Inc.*, 225 F.3d 876, 884 (7th Cir. 2000). The good faith requirement "is not an enforceable legal duty to be nice or to behave decently in a general way" but it does limit the parties from engaging in "[a]vowedly opportunistic conduct." *Jordan v. Duff & Phelps, Inc.*, 815 F.2d 429, 438 (7th Cir. 1987).

The contract in this case granted MetLife discretion to set the declared rate. The contract is silent as to whether MetLife could delegate rate-setting responsibility to a third party or whether the rate needed to be tied to a particular

asset class. The gap left by such silence is filled in by the implied duty of good faith and fair dealing. If there were evidence that the parties expected that MetLife would not transfer assets or rate-setting responsibility to a third party or expected full disclosure about such transfers, then a jury might conclude that the delegation to Great-West violated MetLife's good-faith covenant. Furthermore, if MetLife had an improper motive or was acting in a capricious manner toward Midco, taking advantage of Midco's lack of control over the declared rate in an opportunistic manner, MetLife violated the good-faith covenant.

MetLife delegated responsibility and assets to Great-West, and it is reasonable to infer that MetLife obscured the nature of this transaction and did not disclose Great-West's rate-setting to Midco. MetLife was motivated by a desire to rid itself of the Midco contract and encourage repapering. But the record lacks evidence from which a jury could conclude that such actions and motive violated the parties' expectations. Unlike a plaintiff alleging the breach of an express contract provision, who can merely recite the contract provision that regulated the defendant's conduct, a plaintiff suing under an implied term must provide evidence of the limitations implied in the contract. *See Capital Options Investments, Inc. v. Goldberg Bros. Commodities*, 958 F.2d 186, 189 (7th Cir. 1992) (determining whether the plaintiff presented "sufficient specific evidence to raise a genuine issue of material fact regarding the reasonableness of [defendant's] actions from which bad faith could be inferred.").

There is no evidence in the record that the parties expected MetLife would never assign Midco's assets or delegate rate-setting responsibility.[2] Midco has not pointed to an express term in the contract from which such an expectation could be inferred nor has Midco presented communications suggesting Midco expected MetLife alone would set the declared rate. Furthermore, Midco has not pointed to an instance from the parties' course of dealing that suggests they shared an expectation against assignment.

Midco argues that it had several reasonable expectations with respect to its MetLife investment. [110] at 7–8. It says it expected: its rate to be set the same way as for other investors in MetLife's Stable Value Fund; disclosure of any change in circumstances concerning rate-setting; and MetLife's oversight over Great-West. But there is no evidence to support these inferences about the parties' expectations in the 1990s. Midco is entitled to favorable inferences, but they must be grounded in evidence. Hunches about the scope of MetLife's responsibilities, when the contract allowed MetLife to determine the rate without qualification, do not create a genuine issue of material fact.

In the absence of specific evidence about how the parties expected MetLife's discretion would be cabined, Midco could have submitted evidence showing that

---

[2] MetLife points out that there was a time when MetLife set the declared rate even though the contract in place was between Midco and New England Mutual. This must mean, so the argument goes, that Midco expected transfers and delegations of rate-setting. Such an inference is not appropriate at this stage of the case. There is a difference between a merger (as between New England Mutual and MetLife) and a sale of a portfolio (as between MetLife and Great-West). Inferences should be drawn in Midco's favor, and as such, an expectation that rate-setting could be delegated cannot be assumed from the merger. Nevertheless, there is no evidence from which a jury could infer that Midco did *not* expect any delegation or transfers during the life of the contract.

7

reinsurance transactions such as the one at issue here deviate from the general practices of the 401(k) administration industry. If Midco could show that delegating assets and responsibility to a third party without policyholder consent was an unusual act for an insurance company, a factfinder could conclude that the 2006 transaction violated the parties' expectations. But Midco has not submitted an expert report or any other opinion characterizing the industry in such a way. Thus the factfinder would need to rely on MetLife's experts for context. These experts testified that reinsurance transactions like the one at issue here are consistent with the custom and practice of the insurance industry. Books of business are frequently sold to third-party administrators. Because Midco has not submitted evidence providing a different context for the reinsurance transaction, the MetLife experts' opinions are essentially unrebutted.

Another way to prove bad faith is to argue that there was no legitimate business reason for the transaction, thus it was made without a proper motive. *See Wilson v. Career Educ. Corp.*, 844 F.3d 686, 691 (7th Cir. 2016) (an employer does not act in bad faith when acting in "furtherance of legitimate corporate interests"). Midco has evidence that MetLife wanted to unilaterally terminate the contract, and the firm opted for the reinsurance transaction to achieve this outcome. But Midco has not provided evidence showing that such a motive was improper. MetLife's expert witness gave a legitimate business reason for such conduct. When an insurer sells a book a business, it risks delay and holdout problems if it seeks the consent of each policyholder. But regulators frown upon forcing policyholders to repaper

8

without consent. Thus the type of transaction MetLife opted for here provided a middle way. MetLife could sell its 401(k) administration business without delay, but policyholders such as Midco retained the option to decline repapering with the third party. The expert's explanation for why MetLife's motive was legitimate, rather than avowedly opportunistic, is unrebutted in the record.

Finally, Midco argues that it was not the 2006 transaction itself that violated the parties' expectations or ran afoul of proper motives, but MetLife's lack of full disclosure about this transaction and Great-West's role in investment decisions.[3] In particular, Midco argues improper intentions or bad faith could be inferred from the references to the "MetLife Stable Value Option" even after the 2006 transaction. MetLife describes these statements as mistakes, but a jury could infer otherwise. Nevertheless, even if MetLife intentionally obscured Great-West's role, there is no evidence that such conduct breached MetLife's contractual obligations to determine return rates in good faith. MetLife may not have wanted to alert Midco to the delegation to Great-West, but it was under no fiduciary duty to disclose and there is no evidence that Great-West's investment strategy was unreasonable. As long as MetLife exercised its discretion in good faith, its failure to disclose how it exercised

---

[3] There is no dispute that Midco knew that Great-West held the assets, as described in the Summary Annual Reports. MetLife argues that only reasonable inference to be drawn from that disclosure is that Great-West was setting the rate. But as compelling as such an inference might be, on summary judgment, I decline to draw it because it would not be in Midco's favor. The undisputed evidence is consistent with an inference that Midco did not know (until 2014) that Great-West was setting the rate. However, the non-disclosure theory of a breach of the implied covenant of good faith and fair dealing is a new theory, raised for the first time in response to the motion for summary judgment. It was not plaintiff's theory at the motion-to-dismiss stage, and so it is waived. I reach its merits in the interests of completeness.

its discretion is not a breach of the implied covenant.[4] MetLife's conduct falls short of the sort of arbitrary and capricious conduct required to prove a breach of the duty of good faith.

The parties signed a contract in 1999 that placed no limits on MetLife's discretion to assign its responsibility and contained no requirements for disclosure of such assignments. There is no evidence that additional terms regarding assignment and disclosure were implied into the parties' agreement, or that MetLife exercised its discretion in bad faith when it delegated to Great-West. Without such evidence, MetLife is entitled to judgment as a matter of law.

## IV. Conclusion

MetLife's motion for summary judgment [93] is granted. The Clerk shall enter final judgment in favor of defendant.

ENTER:

*[signature]*

Manish S. Shah
United States District Judge

Date: July 5, 2017

---

[4] MetLife argues that Midco waived any expectation that MetLife would not delegate its rate-setting responsibility when it failed to object after receiving notice, for many years, that Great-West was playing some role with the assets. With a single inquiry, Midco could have learned Great-West's role (as Midco learned in 2014). Since Midco is the non-movant, however, I decline to infer that its failure to inquire amounted to an intentional relinquishment of its contractual rights, because there is evidence that it continued to receive a description of its investment as one with MetLife, and thus a jury might decide that it had no reason to inquire.